# Exhibit C

2003-00968

968

4/9/03

*To be Argued by:*
**DOUGLAS A. FRANKLIN**
*(Time Requested: 15 Minutes)*

---

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : FIRST DEPARTMENT

PAVARINI CONSTRUCTION CO., INC.
And BLAKESLEE PRESTRESS, INC.,

INDEX NO. 98/601034

        Plaintiffs – Appellants,

    -against-

CONTINENTAL INSURANCE COMPANY, CIGNA PROPERTY & CASUALTY COMPANIES, THE TRAVELERS GROUP, AETNA CASUALTY & SURETY, TRANS AMERICA INSURANCE COMPANY, ROYAL INDEMNITY CO., ROYAL INSURANCE CO., FEDERAL INSURANCE CO., NATIONAL UNION, INTERNATIONAL INSURANCE COMPANY, FIDELITY AND CASUALTY INSURANCE CO., CNA INSURANCE COMPANIES, THE HARTFORD, RELIANCE INSURANCE CO., GREAT AMERICAN INSURANCE COMPANIES, SCOTTSDALE INSURANCE COMPANY

        Defendants – Respondents.

---

### APPELLATE BRIEF ON BEHALF OF PLAINTIFFS/APPELLANTS PAVARINI CONSTRUCTION COMPANY AND BLAKESLEE PRESTRESS

---

                              Peckar & Abramson, P.C.
                              546 Fifth Avenue, 17th Floor
                              New York, NY 10036
                              (212) 382-0909

Douglas A. Franklin, Esq.
On the Brief.

---

[Reproduced on Recycled Paper]

# TABLE OF CONTENTS

**PAGE NO.**

PRELIMINARY STATEMENT .................................................................................. 1

QUESTIONS PRESENTED ........................................................................................ 3

NATURE OF THE ACTION AND FACTUAL BACKGROUND ........................... 4

    Insurers and Coverages ..................................................................................... 4

    Procedural History of the Motions in the Trial Court ...................................... 8

    Certain Portions of the Underlying Decision are Moot, and
    Thus are Not Subjects of This Appeal ............................................................. 9

    Stipulations of Discontinuance ......................................................................... 9

    Other Defendants Against Whom Some Or All Claims May
    Be Dismissed, Per Plaintiffs' "Summary" of Insurance
    Policies (A1481-A1483) ................................................................................. 10

    Plaintiffs' Defense and Indemnity Costs. ...................................................... 11

    Liability of the Excess Insurers for Defense Costs ....................................... 11

    Plaintiff's Cross-Motion for Entry of Default and Taxed Costs .................... 12

    Certain Facts .................................................................................................. 12

POINT I

    MOST OF THE DAMAGES FOR WHICH GAI CLAIMED
    AGAINST PAVARINI AROSE OUT OF AN
    "OCCURRENCE" AS THAT TERM IS DEFINED IN THE
    APPLICABLE INSURANCE POLICIES ..................................................... 15

    The Fuller Case and the "Business Risk" Doctrine ....................................... 15

    History and Evolution of the CGL Policy Since 1973:
    Exclusions Narrowed, Coverage Expanded ................................................... 17

    The 1976 Broad-Form Property Damage Endorsement (BFPD) .................. 19

**PAGE NO.**

The 1986 CGL Form..................................................................20

Effect Of These Changes On The Construction Of The CGL
Policies At Bar........................................................................21

Cases Applying the Appropriate Detailed Approach to Policy
Construction, including Adler & Neilson.................................23

The Appropriate Result in the Case at Bar...............................30

**POINT II**

**THE POLICY EXCLUSIONS ASSERTED BY THE PRIMARY CGL INSURERS DO NOT APPLY TO EXCUSE THEM FROM PROVIDING A DEFENSE IN THIS CASE**....................31

a) The "Faulty Workmanship" Exclusions, J(5) and J(6), Are Not Applicable To This Loss..............................31

b) In The Alternative, If Exclusions j(5) and j(6) Apply, They Should Be Narrowly Construed Only To Refer To The Defective Work Causing The Damages....................33

c) The "Products" or "Sistership" Exclusion (Subparagraph "(n)" Of The Exclusions) Is Not Applicable..........................38

d) The Exclusion For "Construction Management Services" Does Not Apply............................................39

e) The Exclusion For "Property Damage" To "Impaired Property" (Exclusion m Of The CGL Policy) Is Not Applicable To This Case..................................40

**POINT III**

**DEFENDANTS HAVE WAIVED ANY DEFECT OF NOTICE ON THE PART OF PAVARINI AND BLAKESLEE BY FAILING TO RAISE SUCH DEFENSE IN THEIR DISCLAIMERS OR FAILING TO RAISE THE DEFENSE WITHIN A REASONABLE TIME AFTER RECEIVING NOTICE OF CLAIM**....................................41

                                                                                    PAGE NO.

POINT IV

    THE LIQUIDATION AGREEMENT BETWEEN PAVARINI
    AND BLAKESLEE DID NOT PREJUDICE THE INSURERS ............... 44

POINT V

    IF AND WHEN THERE IS A RULING THAT THE
    PRIMARY CGL POLICIES MUST PAY ALL OF THE
    DEFENSE COSTS, OR IN THE ALTERNATIVE, THAT
    THEY HAVE NO DUTY TO DEFEND, THEN THIS
    ACTION CAN BE DISMISSED AS TO THE EXCESS
    INSURERS; OTHERWISE, SUCH DISMISSAL WOULD BE
    PREMATURE .............................................................................................. 47

POINT VI

    THE TRIAL COURT ERRED IN HOLDING THAT
    PAVARINI AND BLAKESLEE HAD "ABANDONED" THIS
    ACTION AS TO DEFENDANT FIDELITY & CASUALTY ................... 51

POINT VII

    THE DAMAGES CLAIMED WERE NOT A
    "KNOWN LOSS" UNDER THE FIDELITY
    & CASUALTY POLICY .......................................................................... 56

POINT VIII

    SINCE THERE ARE ISSUES OF MATERIAL FACT, IT
    WAS NOT APPROPRIATE TO ENTER SUMMARY
    JUDGMENT IN THIS CASE .................................................................. 57

CONCLUSION ................................................................................................... 59

looked to their primary c... s, and each has denied coverage and refused to provide a defense, as they are obligated to do.

## POINT I

### MOST OF THE DAMAGES FOR WHICH GAI CLAIMED AGAINST PAVARINI AROSE OUT OF AN "OCCURRENCE" AS THAT TERM IS DEFINED IN THE APPLICABLE INSURANCE POLICIES

**The Fuller Case and the "Business Risk" Doctrine**

In holding that the damages claimed by GAI did not constitute an "occurrence" under the CGL policies of certain defendants (INA, now Century, and Aetna, now Travelers) the court below relied on this Court's decision in George A. Fuller Co. v. USF&G, 200 A.D.2d 255, 613 N.Y.S.2d 152 (1st Dept. 1994), *appeal denied*, 84 N.Y.2d 806, 621 N.Y.S.2d 515 (1994) (A31;A34-A35). In that case, this Court held that damages to a building caused by the faulty performance of plaintiff's subcontractor could not constitute an "occurrence" under the CGL policy of the defendant insurer, because the defective work constituted a breach of the plaintiff's construction contract and "the only damages claimed were those inherent in the defective work." Fuller relied on two other cases, Parkset Plumbing & Heating Corp. v. Reliance Insurance Co., 87 A.D.2d 646, 448 N.Y.S.2d 739 (2d Dept. 1982), and Zandri Construction Co., Inc v. Fireman's Insurance Co. of Newark, 81 A.D.2d 106, 440 N.Y.S.2d 353, *affirmed sub nom.* Zandri Construction Co. v. Stanley H. Calkins, Inc., 54 N.Y.2d 999, 446 N.Y.S. 2d 45 (1981). Significantly, Fuller relied on Zandri and Parkset for the general proposition that a claim "sounding in contract and not in negligence" (613 N.Y.S.2d at 155) cannot be covered

under a CGL policy. <u>Fuller</u> made no detailed examination of the policy provisions in the CGL policy before it.

However, the <u>Zandri</u> and <u>Parkset</u> cases had been decided in 1981, and the form of the Insurance Services Office (I.S.O.)[4] CGL form had changed significantly in the interim.

The general proposition that holds that claims "sounding in contract" are not covered under a CGL policy stems from the "business risk" doctrine, the origins and contours of which are described by James Duffy O'Connor in <u>What Every Construction Lawyer Should Know About CGL Coverage For Defective Construction</u>, CONSTRUCTION LAWYER, Winter 2001, at 3 (hereinafter "O'Connor") and by Clifford J. Shapiro and Neil B. Posner in their article, <u>It Was an Accident: Inadvertent Construction Defects are an "Occurrence" under Commercial General Liability Insurance Policies</u>, COVERAGE, March/April 2000, at 3 (hereinafter "Shapiro and Posner"). O'Connor, <u>supra</u>, describes the "business risk" doctrine as based on a "theoretical concept" that was "popularized" in law review article by Roger C. Henderson in the <u>Nebraska Law Review</u>[5] only a few years before the insurance industry revised the CGL form in a way that rendered his analysis inapplicable. O'Connor, <u>supra</u>, at 15. He outlines it as follows:

> The insured, as a source of goods or services, may be liable
> as a matter of contract law to make good on products or
> work which is defective or otherwise unsuitable because it

---

[4] The Insurance Services Office is an insurance industry organization that, among other things, prepares and disseminates standard form policies. <u>Maryland Casualty Co. v. Reeder, 270 Cal. Rptr. 719, 722, 724-25 (Cal. App. 1990)</u>

[5] <u>Roger C. Henderson, Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know, 50 Neb. L. Rev. 415 (1971)</u>

>   is lacking in some capacity.... This liability, however, is
>   not what the coverages in question are designed to protect
>   against. The coverage is for tort liability for physical
>   damages to others and not for contractual liability of the
>   insured for economic loss because the product or completed
>   work is not that for which the person bargained.

   Id.

**History and Evolution of the CGL Policy Since 1973:**
**Exclusions Narrowed, Coverage Expanded**

O'Connor further recounts how the policy exclusions contained in the 1966 form of CGL policy examined by Professor Henderson were significantly narrowed by the Broad Form Property Damage ("BFPD") endorsement to the CGL form, which was coming into wider use in the early 1970s, after the publication of the Henderson article. It also describes how the New Jersey Supreme Court, citing and relying on the Henderson article, adopted the "business risk" doctrine in its decision in Weedo v. Stone-E- Brick, Inc., 405 A.2d 788 (N.J. 1979), which in turn was taken up by the Minnesota Supreme Court in Bor-Son Building Corp. v. Employers Commercial Union Insurance Co., 323 N.W.2d 58 (Minn. 1982) and in Knutson Construction Co. v. St. Paul Fire & Marine Insurance Co. of America, 396 N.W.2d 229 (Minn. 1986). It is O'Connor's view that the "business risk" analysis, summarized above, had already been rendered obsolete by changes in the ISO form of CGL policy before the above-cited cases were decided, and they simply failed to take these changes into account.

Shapiro and Posner do not use the term "business risk doctrine," but emphasize the findings of the courts employing it that a claim for a construction defect does not allege an "occurrence" under the CGL policy:

>   ...allegations of property damage that arise out of defective
>   construction work is [sic] the "natural and ordinary" result

17

> of the insured's conduct and is therefore to be "expected." Analyzed this way, property damage allegedly caused by inadvertent construction defects is, by definition, not caused by an "accident," and is therefore held to fall outside the scope of the term "occurrence." Even where it is undisputed that the insured did not *subjectively* intend to provide defective work, these courts find that there is no insurance coverage by concluding *objectively* that the alleged property damage is the "natural and ordinary consequences" of the insured's conduct.
>
> This analysis of the "occurrence" issue is also curious. To most people, property damage caused by inadvertent construction defects is not in any sense "natural and ordinary" or to be "expected." To the contrary, most people would readily conclude that *unintended* construction defects give rise to *accidental* property damage.

Shapiro & Posner at 8.

As of 1973, the standard I.S.O. form exclusions for damage to "work" and "products" were still relatively broad. They read:

> This insurance does not apply to:
>
> (n)   property damage to the named insured's products arising out of such products or any part of such products;
>
> (o)   property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof; or out of materials, parts or equipment furnished in connection therewith.

Id. at 5.

This form provided the genesis of the "business risk" doctrine. Shapiro and Posner note that these clauses were interpreted broadly to exclude all damage to or arising out of the insured's own work. Though the term "products" had not been intended by the drafters to apply to real property, it was interpreted to do so by some courts construing the CGL

form. The breadth and sweep of these exclusions gave force to the theory that they excluded all possible coverage for claims sounding in contract. Id. at 5.

**The 1976 Broad-Form Property Damage Endorsement (BFPD)**

By the mid-1970's, however, and even before the Weedo, Bor-Son and Knutson cases were decided, the widespread use of the Insurance Services Office's Broad Form Property Damage Endorsement ("BFPD") had rendered the "business risk" doctrine questionable as an approach to the actual policy provisions of the CGL policy. In 1976, the BFPD became widely available to purchasers for an additional premium and was "typically added" to the policies of construction contractors. Id. at 6. In place of exclusions "(n)" and "(o)," supra, it provided revised exclusions for damage to

> (d) that particular part of any property
>   (i) upon which operations are being performed by or on behalf of the named insured at the time of the property damage arising out of such operations;
>   (ii) out of which property damage arises,
>   (iii) the restoration, repair, or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured.
>
> Id. at 6.

This change added the limiting language, "that particular part of any property." Shapiro and Posner note that "where differentiation between the work to be performed by the insured contractor and the subcontractor was clear, . . . courts were prepared to find that the policy exclusion precluded coverage for repair or replacement of the faulty work performed by the subcontractor but not the cost to repair the work of others . . . ." Id. at 6. Also part of the 1976 BFPD was a change with respect to "competed operations," omitting the phrase "on behalf of" from the exclusion for damage to work done "by or on

19

behalf of" the contractor, so that it now read, "by the named insured...." Despite the obvious implications of this change, insurers argued that this was not intended to exempt work performed by subcontractors from the exclusion with respect to completed work, and courts came down on both sides of the issue. Id. at 6.

### The 1986 CGL Form

The trend of narrowing property damage exclusions continued with the introduction of the I.S.O.'s 1986 CGL policy form, which incorporated the old BFPD endorsement into the body of the CGL form itself. In a new exclusion "l," (essentially the same exclusion "l" as appears in the CGL policies in this action) the CGL form now made explicit that the exclusion for "completed operations" of the insured[6] applied to:

> "Property damage to "your work" arising out of it or any part of it and included in the "Products-Completed Operations Hazard."
>
> <u>This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.</u>
>
> (Id. at 7; emphasis by Shapiro and Posner.)

Shapiro and Posner note that this demonstrated the intent of the drafters to provide that damage to a construction project caused by a subcontractor is an "occurrence," at least from the standpoint of an insured who is a general contractor, like Pavarini in the case at bar. Id., at 7.

The 1986 CGL form also modified the "particular part" exclusions of the 1976 BFPD, paragraph "(d)" quoted above, so that the exclusion now read:

> This insurance does not apply to:

---

[6] This actually creates a significant coverage for "completed operations" as explained below at p. 33.

20

> \* \* \*
>
> j.  "Property damage" to:
>
> > (5) That particular part of real property on which you or any subcontractors working directly or indirectly on your behalf are performing operations, it the "property damage" arises out of those operations; or
> >
> > (6) That particular part of any real property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
> > \* \* \*
>
> **Paragraph 6 of this exclusion does not apply to "property damage" included in the "Products-Completed Operations Hazard."**
>
> (Shapiro and Posner at 7, emphasis supplied.)

Thus the new language (which is that of the current form) specifically provided that the "faulty workmanship exclusion," paragraph 2j(6) of the CGL form, does not apply to property damage that occurs after operations are complete.

**Effect Of These Changes On The Construction Of The CGL Policies At Bar**

In Franco, *Insurance Coverage For Faulty Workmanship Claims Under Commercial Liability Policies*, 30 Tort and Insurance Law Journal 785, 787 (1995), the author quotes the following discussion, representing the industry viewpoint, regarding Exclusion l. and exclusion j., quoted above:

> An example of how exclusion (l) could apply as is follows. The named insured is a general contractor who has built an apartment house with the services of numerous contractors. After the building is completed and put to its intended use, a defect in the building's wiring (put in by a subcontractor) causes the building, including the work of the general contractor and other subcontractors, to sustain substantial

21

fire damage. The named insured is sued by the building's owner. Although the named insured's policy excludes damage to "your work" arising out of it or any part of it, the second part of exclusion (1) makes it clear that the exclusion does not apply to the claim. That is because the *work out of which the damage arose* was performed on the named insured's behalf by a subcontractor. Note that part (6) of exclusion (j) also would not apply to the loss, since part (6) is stated not to apply to property damage with the products completed operations hazard. Thus, barring the application of some other exclusion or adverse policy condition, the loss should be covered, including the part out of which the damage arose.

Casualty & Surety FC&S Bulletins[7] (National Underwriter), Sept. 1993 at Aa17, quoted in Franco, supra.

See, also, National Union Fire Insurance Co. v. Structural Systems Technology, Inc., 964 F.2d 759 (8th Cir. 1992).

The above hypothetical from FC&S Bulletins bears a striking resemblance to the case at bar. As is described in detail in the Affidavit of George Pavarini (A611-A617), GAI alleged substantial claims for property damage allegedly caused by the volumetric expansion and contraction of the precast members furnished and installed by Blakeslee. GAI's claims alleged that the deficient work of Blakeslee caused:

- substantial cracking in the cast in place concrete walls supporting the precast members;
- substantial ripping apart of the caulked joints;
- substantial ripping apart of the expansion joint material;
- substantial ripping of the waterproof membrane material that was placed on top of the precast tees to waterproof the structure;

---

[7] In Maryland Casualty Co. v. Reeder, 221 Cal. App. 3rd 961, 270 Cal. Rptr. 719 (Cal. Dist. Ct. App. 1990), the court described the industry's "FC&S" bulletins as follows:

> The FC&S Bulletin is used by insurance agents and brokers to interpret standard insurance policy provisions. (Fireguard Sprinkler Systems v. Scottsdale Ins., (9th Cir. 1988) 864 F.2d 648, 652 (Fireguard).)

22

- Substantial cracking of the concrete pour strips and the fill areas at the entrance to the helix ramp;
- The complete removal of the waterproofing, caulking, concrete fill, concrete planters and landscaping to repair the damaged work in the loading dock.
- Substantial leakage into the structure and onto the cars parked below as a result of the cracking and ripping apart of work of other subcontractors.

In summary, all of these claims relate to alleged damages to work of other subcontractors or to the property of GAI. These are not claims to repair Blakeslee's work. (Affidavit of George Pavarini at paragraph 5, A611.) Accordingly Pavarini has asserted an insurable claim to recover defense and indemnity costs, under both its own CGL policies and as an additional insured under Blakeslee's primary CGL policies. (Pavarini Affidavit at paragraph 8 and exhibits thereto, A613-A617).

Given the narrowing of the CGL exclusions and the concomitant expansion of coverage since 1970, the broad "business risk" doctrine as expressed in Weedo and other contemporaneous cases (such as Parkset and Zandri) should have been scrapped or at least modified to take into account the broadening of coverage that had occurred. In particular, if one examines the detailed provisions of the policy as set forth above and in Point II, infra, it becomes apparent that it is no longer valid to state broadly that a claim "sounding in contract" cannot constitute an "occurrence" under the I.S.O. form CGL policy (the form used by Pavarini's and Blakeslee's CGL insurers).

<u>Cases Applying the Appropriate Detailed Approach to Policy Construction, including Adler & Neilson</u>

A number of cases collected and described in Shapiro and Posner, supra, and in a subsequent article by Clifford J. Shapiro, Point/Counterpoint: Inadvertent Construction Defects Are an "Occurrence" under CGL Policies, CONSTRUCTION LAWYER, Spring, 2002, at 15, show the type of analysis that should be required, beginning with

Federated Mutual Insurance Co. v. Grapevine Excavation, Inc., 197 F.3d 720 (5th Cir. 1999, rehearing denied, Jan. 5, 2000). In that case, a general contractor was responsible for construction of a new Wal-Mart and engaged an excavating subcontractor to prepare the site of the parking lot so that it could be paved. The excavating subcontractor's inadequate preparation of the lot damaged the work of the paving subcontractor, and the general contractor filed suit against the excavating subcontractor, which in turn sought a defense under its CGL policy. The CGL insurer argued that the excavating subcontractor's performance was "an intentional act, and therefore, did not constitute an 'occurrence' as that term is defined in the Federated and Maryland CGL policies."

The Fifth Circuit, construing Texas law, noted that:

> Courts have consistently held that damage wreaked on the work product of a third party – as opposed to that of the insured – is presumed to have been unexpected and, therefore, constitutes an accident or an occurrence.

Id., at 725; footnotes omitted.

The court noted that although the performance of the subcontractor's work was certainly intentional, the deficient result and the ensuing damages were not, but obviously resulted from negligence. While the damage to the subcontractor's own work was excluded from coverage, the subcontractor was entitled to coverage and defense for damages to other portions of the property damaged as a result of its work.

In Erie Insurance Exchange v. Colony Development Corp., 736 N.E.2d 941 (Ohio Ct. App. 1999), the plaintiff was general contractor and developer in the construction of a condominium complex. After construction was completed, the condominium association brought an action against the contractor for damages to the condominium units, the common areas and the surrounding landscape. In a declaratory judgment action by the

contractor against its CGL insurer, the trial court had held that the insurer was not required to defend the contractor because no "occurrence" was alleged by the condominium association and the claims against the contractor were excluded under the policies' "completed operations" exclusion.

The appellate court noted, at 736 N.E.2d 947:

> Erie [the insurer] cites numerous cases for the general proposition that a policy is not a performance bond and, hence, does not cover claims for insufficient or defective work or the repair and replacement of that work. [Citing cases.] While this general proposition is true, the rationale for the proposition is not that the allegations of negligent construction or design practices do not fall within the broad coverage for property damage caused by an occurrence, but that, as discussed in the balance of this opinion, the damages resulting from such practices are usually excluded from coverage by the standard exclusions found in such policies.

(Emphasis supplied; bracketed words added/substituted.)

In examining the exclusions, the court noted that there were allegations (as there are in the case at bar) that subcontractors had performed some of the defective work on behalf of the contractor, and that the "completed operations" exclusion of the policy (like exclusion "l" of the policies in the instant case) specifically provided that the exclusion did not apply "if the damaged work or the work out of which the damage arises was performed on [the insured's] behalf by a subcontractor." Id. at 736 N.E.2d 949. The court held that, if some of the work giving rise to the damages was performed by a subcontractor, then under the terms of the policy the CGL insurer should be required to defend the general contractor.

In High Country Associates v. New Hampshire Insurance Co., 648 A.2d 474 (N.H. 1994), the plaintiff developer/builder of a condominium development had been

25

sued by the condominium association for "breach of an implied warranty of workmanlike quality and for negligence alleging that the defendants' faulty design, selection of materials, construction, supervision and inspection of the condominium units resulted in substantial moisture seepage into the buildings, causing mildew and rotting of the walls, and loss of structural integrity." Id. at 476. The trial court, following precedents applying the 'business risk" doctrine, had held that:

> ...because the Association's allegations were based on High Country Associates' defective workmanship, they did not constitute an occurrence within the meaning of the policy.
>
> Id. at 476.

The New Hampshire Supreme Court reversed, noting that in the cases relied on by the trial court, the only damage alleged was to the defective work itself. In High Country Associates, however, as in the case at bar, there was damage to other portions of the premises resulting from the defective work. This, the court held, constituted an "occurrence," noting that the plaintiff's interpretation of policy term "accident" as "circumstances that were unexpected or unintended from the standpoint of the insured, but not limited to a sudden, precipitous event" was both reasonable and consistent with the court's prior definitions of the term. Id. at 477.

In O'Shaughnessy v. Smuckler Corp., 343 N.W.2d 99 (Minn. Ct. App. 1996), the Court of Appeals of Minnesota re-examined the Bor-Son and Knutson cases, supra, which had first applied the "business risk" doctrine in that State. The court noted that Knutson, supra, 396 N.W. 2d at 235, had articulated the rationale of the doctrine as follows:

26

> If insurance proceeds could be used to pay for the repairing and/or replacing of poorly constructed products, the contractor or subcontractor could receive initial payment for its work and then receive subsequent payment from the insurance company to repair and replace it.

The <u>O'Shaughnessy</u> court, however, did not feel that the doctrine should be applied indiscriminately:

> <u>We note that this rationale is less applicable to a claim by a general contractor for the defective work of its subcontractor.</u> A general contractor has minimal control over the work of its subcontractors by definition, and the fact that the general contractor receives coverage will not relieve the subcontractor of ultimate liability for unworkmanlike or defective work.
>
> O'Shaughnessy, <u>supra</u>, at <u>543 N.W.2d at 102</u>. (Emphasis supplied.)

The court then noted the 1986 revision to the "completed operations" exclusion of the CGL policy, discussed above, that had been made since the earlier decisions of the Minnesota Supreme Court in <u>Bor-Son</u> and <u>Knutson</u>, <u>Id.</u> at <u>543 N.W. 2d 104</u>. (See subparagraph 21 of the CGL policies of the defendants INA (now Century) (A138); Travelers (A183); Aetna (A1100); CNA (A1434) and Reliance (A256, A288, A323) [see the table of primary CGL insurers at pp. 5-6, <u>supra</u>], which contain the same language.) It held that because of the 1986 policy changes, and specifically because of the exception to exclusion "l" for the work of subcontractors, "[w]e must conclude that the exception restores coverage to a sub-category of 'your work.'" <u>Id.</u> Finally, the court in <u>O'Shaughnessy</u> noted that its holding that the work of subcontractors of the insured was now covered under the terms of the CGL policy was consistent with the interpretation of

27

"industry commentators" as set forth in Fire, Casualty & Surety Bulletins[8], Public Liability, Aa 16-17 (the National Underwriter Co. 1993). Id. at 105 (and quoted above at pp. 21-22).

With respect to the aspect of the "business risk" doctrine that broadly distinguishes between covered and noncovered CGL claims based on whether they sound in contract or in tort, the California Supreme Court in Vandenberg v. Superior Court, 21 Cal. 4th 815, 982 P.2d 229 (1999), said, at 21 Cal. 4th 838, 982 P.2d 243-244:

> Coverage under a CGL insurance policy is not based upon the fortuity of the form of action chosen by the injured party. Thus, as the Court of Appeals stated, determination of coverage must be made individually by considering "the nature of [the] property, the injury, and the risk that caused the injury, in the light of the particular provisions of each applicable insurance policy."

The California Supreme Court went on to note that virtually all of the major insurance treatises endorse this principle. 21 Cal. 4th at 841, 982 P.2d at 245-246.

Finally, a case from the New York Court of Appeals points to the same conclusion. In Adler & Nielson Co., Inc. v. Insurance Co. of North America, 56 N.Y.2d 540, 449 N.Y.S.2d 957 (1982), the insured was a subcontractor whose incorrect work caused damage to the owner's premises and to the work of other subcontractors. Although the Court applied the "completed operations" exclusion to the subcontractor's own work, it recognized that damage which was caused by that work to other portions of the premises was insured under the subcontractor's CGL policy. In Adler, the insurer also argued (as Century and INA and Travelers have argued in this case) that there was no "property damage" or "occurrence" giving rise to the damages claimed, since all of

---

[8] See footnote 7 at p. 22, supra, regarding the Fire, Casualty & Surety or "FC&S" Bulletin, an insurance industry publication.

28

them were created by the subcontractor in the performance of its subcontract and in breach thereof.

Responding to this contention, the Court of Appeals noted that in <u>Sturges Manufacturing Co. v. Utica Mutual Insurance Co., 37 N.Y.2d 69, 371 N.Y.S.2d 444</u>, it had held that

> where the defect was in stitching on the strap component of ski bindings the insurer was held obliged to defend the manufacturer of the straps against claims for damages to *the bindings*, (i.e., the larger unit of which the insured's product was but a component).
>
> <u>Adler, supra, 56 N.Y.2d at 542, 449 N.Y.S. 2d at 958</u>.

Analogizing to <u>Sturges</u>, the Court of Appeals held that since the subcontractor's own work was on a defined portion of the building, damages which it created to other parts of the building on which it had not directly worked, were not excluded from coverage by the "your work" provision. See, also, <u>Apache Foam Products Division v. Continental Insurance, 130 A.D.2d 933, 528 N.Y.S.2d 448 (4th Dept. 1988)</u>; <u>Wolk v. Royal Indemnity Co., 27 Misc. 2d 478, 210 N.Y.S.2d 677 (App. Term 2d Dept 1961)</u>.

The <u>Adler</u> decision is in line with the kind of policy analysis the courts performed in the <u>Grapevine</u>, <u>Erie</u>, <u>High Country</u>, <u>O'Shaughnessy</u>, and <u>Vandenberg</u> cases, <u>supra.</u> These decisions point to the conclusion that the approach taken in <u>Fuller</u>, an articulation of the "business risk doctrine" embodied in a broad assertion that damage resulting from defective work of a subcontractor on a given project cannot be covered under the general contractor's CGL policy because it is all the "work" of the contractor, or that such work cannot be covered because the subcontractor's breach "sounds in contract," is no longer valid. What courts should do is examine the meaning of the policy as a whole and each

29