USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: NOV 15 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ILLINOIS NATIONAL INSURANCE COMPANY, THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

Plaintiffs,

-v-

TUTOR PERINI CORPORATION,

Defendant.

TUTOR PERINI CORPORATION,

Third-Party Plaintiff,

-v-

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

Third-Party Defendant.

11 Civ. 431 (KBF)

MEMORANDUM DECISION &ORDER

KATHERINE B. FORREST, District Judge:

On January 1, 2011, plaintiffs Illinois National Insurance Company ("Illinois National"), The Insurance Company of the State of Pennsylvania ("ICSOP"), and National Union Fire Insurance Company of Pittsburgh, PA ("National Union" and with Illinois National and ICSOP, the "Chartis Insurers") sued defendant Tutor

Perini Corporation ("Tutor Perini") for a declaratory judgment that none of the Chartis Insurers were required to insure the Façade Failure caused by Tutor Perini's construction of a bus terminal for the New York City Metropolitan Transit Authority (the "MTA").[1]

On February 24, 2012, Tutor Perini filed a third-party complaint against Certain Underwriters at Lloyd's, London ("Lloyd's") who sold Policy Number 576/UF7274400 (the "Lloyd's Policy") to the MTA, with a policy period of April 1, 2001 to October 1, 2008. Tutor Perini sought a declaration that Lloyd's must provide defense and/or indemnity coverage under the Lloyd's Policy for the Façade Failure, and claiming that Lloyd's breached the Lloyd's Policy by failing to provide that coverage.

The Chartis Insurers and Lloyd's have now separately moved for summary judgment. Both motions were fully submitted as of September 5, 2012.

For the reasons set forth below, both motions are GRANTED.

## I. FACTUAL BACKGGROUND

### A. The Project

In 2002, Tutor Perini was hired as the general contractor to build a bus depot "Depot") for MTA. As part of that work, Tutor Perini performed construction on the Depot's façade. There is no dispute that Tutor Perini was responsible for the work of any subcontractors on the Depot.

[1] The Chartis Insurers filed an amended complaint on June 28, 2001. (Dkt. No. 18.)

The Depot's construction was substantially complete--and the Depot was put into use in 2003. However, it is not disputed that there were several construction-related tasks (a so-called "punch list") that remained to be performed as of the Depot's opening in 2003--and that Tutor Perini (or its subcontractors) performed the punch list tasks over the ensuing years. The Depot was finally completed in 2007.

The parties agree that on April 17, 2008, an area of masonry on the façade of the Depot collapsed (the "Façade Failure"). Tutor Perini concedes that certain of its own employees knew of the collapse immediately. John Loftus, president of Tutor Perini's civil division, a senior executive and the most senior person among the 100 to 150 New York-based Tutor Perini employees, was aware of the Façade Failure the day after it occurred (i.e., April 18, 2008). Indeed, Tutor Perini representatives--including Loftus--met with the MTA at the Depot the day after the failure.

On April 22, 2008, the Acting Program Director for the MTA sent a letter to Tutor Perini's project executive, stating that Loftus had been notified of the Depot's Façade Failure, and that representatives, including the project executive, had met with the MTA regarding the failure the next day. That same day, the MTA notified Tutor Perini that it was undertaking emergency repairs to restore the Depot's façade. In response, Loftus offered the use of Tutor Perini's engineers to assist with that work. A number of individuals at Tutor Perini, including its General Counsel, Vice President and Controller of its civil group, and project executive were copied on letters concerning the façade failure.

On July 18, 2008, the MTA wrote Tutor Perini stating that it would hold Tutor Perini responsible for all costs in connection with the repairs to the Depot's façade "due to its [Tutor Perini's] defective work."

On August 20, 2008, the MTA informed Tutor Perini that it was considering suing Tutor Perini for general breach of the construction contract.

At least as of November 2008, Tutor Perini's risk management department was formally made aware of the Façade Failure.

A firm retained by the MTA to investigate the reasons for the Façade Failure determined that the Depot's façade failed due to poorly installed brick and mortar; that the wall ties were inadequate and/or improperly installed; that the shelf and clip angles were improperly installed; that the rigid insulation was damaged and/or inadequately installed; the sealant joints were poorly installed; and the cavity behind the brick façade was not of a uniform depth. Tutor Perini did not disagree with the investigator's report. Indeed, Tutor Perini concedes that the work was not performed in conformity with the construction contract.

In January 2009, an individual in Tutor Perini's risk management department notified the MTA Owner Controlled Insurance Program's ("OCIP") Administrator of a potential claim. At that time, Tutor Perini made a proposal to the MTA that included, inter alia, repairing the Depot's façade, paying the MTA $1 million, and tolling the statute of limitations as to claims relating to the work required to repair the façade.

On January 6, 2009, Tutor Perini notified AIG of the Façade Failure. It notified the Chartis Insurers of the Façade Failure that same day. On January 14, 2009, it notified the MTA's on-site OCIP Administrator of the Façade Failure.

In June 2009, Tutor Perini and the MTA entered into an agreement to remedy the defects. As part of that agreement, Tutor Perini conceded that a demand had been made as of April 17, 2008, to cover all costs due to its defective workmanship under the construction contract with the MTA, and agreed to place $5 million into a fund out of which the MTA (via the New York City Transit Authority) would pay for costs and expenses for repair of the façade.

B. The Insurance Policies

The MTA arranged for the Depot project to be insured under MTA's OCIP-- a single insurance program which insures the owner, all enrolled contractors, subcontractors and third-party contractors designated by the owner for the project-- known as the Line Structures 1999 Program. Under the terms of the Structures 1999 Program, the MTA arranged for workers compensation, general liability, excess liability, and builder's risk insurance coverage for each insured at the Depot work site.

Excess coverage for the Depot project under the Structures 1999 Program was provided to the MTA under a commercial umbrella liability policy issued to the MTA by TIG Insurance Company for the policy period March 1, 1999 to March 1, 2004 (the "TIG Policy"). The TIG policy provided coverage for the Depot to Tutor Perini through an owner controlled insurance endorsement.

The TIG policy provides for the following coverage:

> We will pay on YOUR behalf all sums that YOU shall become legally obligated to pay as damages because of PERSONAL INJURY, PROPERTY DAMAGE, OR ADVERTISING INJURY, caused by an OCCURRENCE to which this policy applies during the POLICY PERIOD. The OCCURRENCE must take place in the COVERAGE TERRITORY.

The TIG policy contains a Completed Operations/Products Liability Extension Endorsement, which provides:

> It is hereby understood and agreed that the coverage provided under this policy of the completed operations and/or products hazards is extended to apply to three (3) years after completion of the Metropolitan Transit Authority project.
>
> For purposes of this endorsement, completion of the project is defined by the earlier of the following:
> (a) The date of the final written acceptance of the project.
> (b) In the event the project is abandoned or otherwise remains without work performed for 365 consecutive days, the 366th day.
> (c) The expiration date of the policy.
> (d) The cancellation date of the policy.
>
> It is further understood that all work completed by any subcontractors prior to acceptance of the project will be treated as "Operations" not "Completed Operations" for the period between completion of the subcontractors' work and acceptance of the project by the owner.

In addition to the Line Structures 1999 Program, the MTA obtained an OCIP referred to as the 2000 Structures Program, for which AIG served as the primary insurer. Lloyd's issued the excess liability policy for the 2000 Structures Program--as placed by Willis, the insurance broker for the MTA. Lloyd's issued the MTA the Lloyd's Policy--a commercial umbrella policy (number 576/UF7274400)--for the period April 1, 2001 to April 1, 2008. Although issued to the MTA, the Lloyd's

Policy provided coverage to Tutor Perini through owner controlled insurance endorsements.

The Lloyd's Policy defines an "Occurrence" as:

H. 1. As respects Bodily Injury or Property Damage, an accident, including continuous or repeated exposure to conditions which results in Bodily Injury or Property damage neither expected nor intended from the standpoint of the Insured...

J. 1. Products-Completed Operations Hazard includes all Bodily Injury and Property Damage occurring away from premises you own or rent and arising out of Your Product or Your Work except:
a. products that are still in your physical possession; or
b. work that has not yet been completed or abandoned.
2. Your Work will be deemed completed at the earliest of the following times:
a. When all of the work called for in your contract has been completed;
b. When all of the work to be done at the site has been completed if your contract calls for work at more than one site.
c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

...

N. Your Work includes:

1. Warranties and representations made at any time with respect to the fitness, quality, durability, performance or use of Your Work; and

2. The providing of or failure to provide warnings or instructions.

Lloyd's excess policy also contains certain exclusions--i.e., does not cover--the following:

F. Property Damage to Your Product arising out of it or any part of it.

G. Property Damage to Your Work arising out of it or any part of it and included in the Products-Completed Operations Hazard,

> This exclusion does not apply if the damage work or the work out of which the damage arises was performed on your behalf by a subcontractor.

The Lloyd's Policy also requires that Lloyd's be notified "as soon as practicable" after an Occurrence.

C. The Chartis Insurers

Illinois National issued a commercial general liability ("CGL") policy to the MTA (number GL 933-04-07 RA) (the "Illinois National Policy"). The Illinois National Policy had an initial period through 2000, but the Policy was extended to March 1, 2004. Although the Illinois National Policy was issued to the MTA, it is a "wrap-up policy" that provided coverage to Tutor Perini through owner controlled insurance endorsements.

The Illinois National Policy is an "occurrence" policy, which provides coverage for damages because of "property damage occurring during the policy period" that is caused by an "Occurrence." The Illinois National Policy provides for coverage

> that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We have the right and duty to defend the insured against any 'suit' seeking those damages . . . We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.

Coverage only applies when the bodily injury or property damage occurs during the policy period. In addition, the Illinois National Policy contains an exclusion for property damage arising from incorrectly-performed work. Like the Lloyd's Policy, the Illinois National Policy also requires notice of a claim "as soon as practicable" after an "'occurrence' or an offense which may result in a claim."

ICSOP also provided a CGL "occurrence" policy to Tutor Perini (number GL 161-68-85) (the "ISCOP Policy"). Under the ICSOP policy, "occurrence" and "property damage" are defined similarly to those terms in the Illinois National Policy. The ISCOP Policy also contains a wrap-up exclusion endorsement that excludes coverage arising out of work performed by Tutor Perini--or work performed on Tutor Perini's behalf--except that coverage is afforded on an excess basis only and only in the event other valid and collectible insurance provides coverage. The ISCOP Policy also requires that notice of a claim must be provided "as soon as practicable."

National Union provided an excess CGL policy to Tutor Perini (number BE 6799721) (the "National Union Policy" and with the Lloyd's Policy, the Illinois National Policy and the ISCOP Policy, the "Policies"). That policy likewise is an "occurrence policy" with an "as soon as practicable" notice requirement. Illinois National wrote a "wrap-up" endorsement under the National Union Policy.

II.   LEGAL STANDARD

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making that determination, the court must "construe all evidence in the light most favorable to

the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 539 F.3d 159, 166 (2d Cir. 2010) (citations omitted). In addition, self-serving affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. See BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996). Only disputes over material facts —i.e., "facts that might affect the outcome of the suit under the governing law" — will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## III. DISCUSSION[2]

The Chartis Insurers and Lloyd's have posited a variety of arguments in support of their respective summary judgment motions. The Court deals only with those necessary to resolution of this motion.

### A. The Façade Failure Is Not an "Occurrence" Under the Policies

Each of the Policies covers an "occurrence." The Chartis Insurers and Lloyd's both argue that under the respective Policies, the Façade Failure (which undisputedly occurred due to faulty construction work)[3] does not constitute an "occurrence"--meaning that the Policies do not apply and that coverage is not due from the insurers.

Under New York law, a construction contractor's faulty work resulting in failure of the structure does not constitute an "occurrence." See, e.g., Baker Residential Ltd. P'ship v. Travelers Ins. Co., 10 A.D.3d 586, 782 N.Y.S.2d 249, 250 (1st Dep't 2004) ("The motion court, aptly characterizing the underlying action as 'a classic faulty workmanship/construction contract dispute,' correctly held that the damages sought therein did not arise from an 'occurrence' resulting in damage to property distinct from plaintiffs' own work product, as contemplated by the policy."); Transp. Ins. Co. v. AARK Constr. Grp., Ltd., 526 F. Supp. 2d 350, 356 (E.D.N.Y. 2007) ("An insurer of a CGL policy is not a surety for a construction contractor's

[2] The parties agree that there is no conflict between Massachusetts and New York law as applicable to the policy interpretation and coverage issues in this action. Accordingly, the Court will apply New York law in interpreting the Policies and whether those Policies provide coverage in this instance.
[3] Indeed, as discussed above, Tutor Perini did not lodge any objections to the report by the engineer investigating the Façade Failure--which clearly cited faulty work as the cause of the failure.

defective work.").[4] Indeed, under New York law, a CLG policy (like the Policies here) "does not insure against faulty workmanship in the work product itself but rather faulty workmanship in the work product which creates a legal liability by causing bodily injury or property damage to something other than the work product." George A. Fuller Co. v. U.S. Fidelity & Guar. Co., 200 A.D.2d 255, 259, 613 N.Y.S.2d 152,155 (1st Dep't 1994) (emphasis added); Aquatectonics, Inc. v. The Hartford Cas. Ins. Co., 10-CV-2935, 2012 WL 1020313, at *5 (E.D.N.Y. Mar. 26, 2012). "Thus, an 'occurrence' of property damage under a CGL policy cannot exist where a general contractor's negligent acts only affect the property owner's economic interest in the building." AARK Const. Grp., Ltd., 526 F. Supp. 2d at 357 (quotation marks omitted).

There is no dispute here that the only damage based upon the Façade Failure was to the Depot itself. On that basis, then, the Façade Failure does not constitute an "occurrence," and coverage under the Policies is not triggered. See Pavarini Constr. Co. v. Cont'l Ins. Co., 304 A.D.2d 501, 759 N.Y.S.2d 56 (1st Dep't 2003); Aquatectonics, Inc., 2012 WL 1020313, at *6.

---

[4] The cases cited by Tutor Perini in support of its proposition that "numerous New York cases hold that faulty work can constitute an occurrence" either do not stand for the proposition for which Tutor Perini cites them or are distinguishable from the facts before the Court here--and actually support the finding that an "occurrence" must cause damage or injury to something other than the actual structure. See, e.g., Royal Ins. Co. of Am. v. Ru-Val Elec. Corp., 92 CV 4911, 1996 WL 107512, at *1 (E.D.N.Y. Mar. 8, 1996) (denying summary judgment because the ambiguity of whether "damages caused by the insured [were] simply the costs incurred in correcting the faulty work"; "The insured's work product--the faulty wiring--did not merely injure itself, but caused fire damage to the whole house."); McGroarty v. Great Am. Ins. Co., 36 N.Y.2d 358, 364-65, 368 N.Y.S.2D 485 (N.Y. 1975) (damage to the plaintiff's building from excavation and construction on the insured's adjacent property); Zurich Ins. Co. v. White, 221 A.D.2d 700, 701, 633 N.Y.S.2d 415 (3d Dep't 1995) (damage to cars and boats near a bridge caused by "overspraying" during a paint job).

Tutor Perini argues that it somehow avoids the "occurrence" provision of the policies because the Façade Failure was caused by work performed by subcontractors. That argument does not salvage its claims.

As an initial matter, if the insured is unable to meet its burden of proving coverage, Consol. Edison Co. of N.Y. v. Allstate Ins. Co., 98 N.Y.2d 208, 218, 746 N.Y.S.2d 622 (N.Y. 2002), a court need not determine whether any of the exclusions from coverage would apply, Aquatectonics, Inc., 2012 WL 1020313, at *7.

Further, it is well-settled under New York law that even damage to a property resulting from work performed by contractors does not transform a non-"occurrence" into an "occurrence." Pavarini, 304 A.D.2d at 502; see also Fuller, 200 A.D.2d at 259. This is so because a general contractor is "responsible for the entire project" and all work done by subcontractors is done on the general contractor's behalf. Pavarini, 304 A.D.2d at 502. The Aquatectonics Court recently rejected the identical argument by a general contractor that Tutor Perini makes here. See Aquatectonics, Inc., 2012 WL 1020313, at *8-9. The rationale of Aquatectonics applies with equal force here.

Accordingly, summary judgment in favor of the Chartis Insurers and Lloyd's is appropriate on the basis that the Façade Failure does not constitute an "occurrence" triggering coverage under the Policies.[5]

[5] The claim fails for the independent reason that claims sounding in contract based upon a contractor's faulty workmanship do not trigger CGL policies like the Policies here. See, e.g., Ru-Val Elec. Corp., 1996 WL 107512, at *1; Fuller, 200 A.D.2d at 260. It is undisputed that MTA and Tutor Perini almost immediately agreed that the Façade Failure was a breach of Tutor Perini's contractual obligations. That provides an independent basis for finding that Tutor Perini is not entitled to indemnification for the Façade Failure under the Policies. AARK Constr. Grp., Ltd., 526 F. Supp. 2d at 357 n.3.

B. Timeliness

Even assuming that the Façade Failure constituted an "occurrence" under the Policies, the Chartis Insurers and Lloyd's would be entitled to summary judgment on the basis that Tutor Perini failed to comply with the Policies' requirement that Tutor Perini have notified the insurers of a potential claim based upon an "occurrence" "as soon as practicable."[6]

In the absence of a valid excuse, an insured's failure to provide timely notice of a claim to an insurer is a complete defense. See Am. Home Assur. Co. v. Int'l Ins. Co., 90 N.Y. 2d 433, 440, 661 N.Y.S.2d 584 (N.Y. 2002) ("[A]bsent a valid excuse, a failure to satisfy the notice requirements vitiates the policy and the insurer need not show prejudice before it can assert the defense of noncompliance." (quotation marks and alterations omitted)); AARK Constr. Grp., Ltd., 526 F. Supp. 2d at 358 ("Under New York law, compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy." (quotation marks omitted)). A court may resolve the question of timely notice on summary judgment if: "(1) the facts bearing on the delay in providing notice are not in dispute and (2) the insured has not offered a valid excuse for the delay." AARK Constr. Grp., 526 F. Supp. 2d at 358.

---

[6] As the Chartis Insurers point out, on July 21, 2008, the New York legislature passed a law providing that failure to give notice within a proscribed time period shall not invalidate a claim unless such delay prejudices the insurer. See N.Y. ISC Law § 3420(a)(5). The statute took effect six months later (i.e., February 2009) and applies only to policies issued after that date. Because all of the policies at issue here were issued prior to February 2009, N.Y. ISC Law § 3420(a)(5) does not apply.

As set forth above, there is no dispute that Tutor Perini's top management was not only aware of, but actually went to the site of, the Façade Failure by April 18, 2008--the day after the Façade Failure occurred. There is also no dispute that Tutor Perini's top management, including its General Counsel, received correspondence and communications relating to the Façade Failure and made proposals to resolve the dispute, long before formal notification was provided to any of the Chartis Insurers or Lloyd's.

Tutor Perini argues that insurance policies must be construed against the insurer, and that since Tutor Perini's risk management personnel were not on formal notice until November 2008 and Tutor Perini provided notice of the claim to the insurers in early January, Tutor Perini's notice was timely. According to Tutor Perini, only when it received formal notice to its risk management department can it be deemed to have been on notice--and any delay between November and January is not itself so far out of bounds as to be unreasonable. The Court disagrees on both points.

First, it defies credulity--and no reasonable juror could find--that as of April 18, 2008, Tutor Perini was not on full and appropriate notice that the Depot's façade had failed. The number and level of Tutor Perini personnel with knowledge of the Façade Failure within days of the actual failure on April 17, 2008, were too high and too involved for the Court to draw any other inference. The fact that Tutor Perini's risk management department received a particular notice in November 2008 does not start the clock. By that time, the clock had been ticking--and ticking

loudly--since the Depot's façade failed in April 2008. Indeed, by November 2008, Tutor Perini was hard at work trying to resolve the issue with the MTA. The Façade Failure was a serious issue--one that received attention at high levels within Tutor Perini; one which Tutor Perini proposed to resolve for, inter alia, $1 million during the summer of 2008.

Second, even if this Court were to consider the period between November 2008 and January 2009 as the relevant period, Tutor Perini's waiting even that length of time to provide the insurers notice given the amount of communication between Tutor Perini and the MTA--and the efforts at resolution that were occurring between them--make even a two-month delay unreasonable as a matter of law. See, e.g., Am. Home Assurance Co. v. Republic Ins. Co., 984 F.2d 76, 78 (2d Cir. 1993) (upholding a finding of unreasonable delay when 36 days had elapsed); Atlantic Cas. Inc. Co. v. C.A.L. Constr. Corp., No. 06 CV 4036, 2008 WL 2946060, at *7-9 (E.D.N.Y. July 30, 2008) (delay of one month held to be unreasonable); U.S. Underwriters Ins. Co. v. A&D Maja Constr., Inc., 160 F. Supp. 2d 565, 569 (S.D.N.Y. 2001) ("It has been routinely held that, under New York law, an unexcused delay of one to two months in notifying the insurer is unreasonable as a matter of law.").[7]

[7] Neither of Tutor Perini's two arguments in opposition to the insurers' timeliness arguments is availing. First, Tutor Perini did not adduce any evidence--despite its assertion to the contrary--that it invited the Chartis Insurers to participate in Tutor Perini's settlement negotiations with the MTA. Second, Tutor Perini's argument that the Chartis Insurers delayed in denying coverage even after being informed of a claim in January 2009 cannot work because Tutor Perini had consummated the settlement agreement (i.e., "assumed obligations") with the MTA prior to providing notice to the Chartis Insurers.

Accordingly, this Court finds that Lloyd's and the Chartis Insurers are all entitled to summary judgment for failure by Tutor Perini to provide timely notice as required by the insurance policies (assuming arguendo that an "occurrence" occurred and the Policies even apply here).

C. Independent Action by Tutor Perini

Each of the policies also placed upon Tutor Perini obligations to allow the insurers to participate in any resolution of claim. However, Tutor Perini offered various resolutions--including providing Tutor Perini engineering personnel immediately and even contributing financially by the summer of 2008--without the participation or consent of any of the insurers. Tutor Perini's offers culminated in a written settlement agreement between Tutor Perini and the MTA in the summer of 2009--to which no insurer had consented and in which no insurer had participated.

That independent action by Tutor Perini violated the clear terms of each policy and is an independent basis for granting summary judgment. See Sunham Home Fashions, LLC v. Diamond State Ins. Co., 813 F. Supp. 2d 411, 417 (S.D.N.Y. 2011) (granting the insurer's motion for summary judgment on the basis that the insured failed to obtain the insurer's consent prior to entering into a settlement agreement and thus, the insurer was not liable for reimbursement of the settlement amount); Cont'l Cas. Co. v. ACE Am. Ins. Co., No. 07 Civ. 958, 2009 WL 857594, at *4-5 (S.D.N.Y. Mar. 31, 2009) (granting summary judgment to the insurer when the insured violated the insurance policy's "consent-to-settle provision" by entering into a settlement agreement without the insurer's consent); Vigilant Ins. Co. v. Bear

Stearns Cos. Inc., 10 N.Y.3d 170, 855 N.Y.S.2d 45 (N.Y. 2008) (reversing the Appellate Division's order denying the insurer's summary judgment because the insured breached the insurance policy by entering into a settlement agreement without the insurance carriers' consent).[8]

D. Mass. Gen. Law. c 93A Claim

Tutor Perini has also asserted a claim against the Chartis Insurers under Massachusetts' unfair business practices statute--M.G.L. c. 93A, § 11. The statute provides redress to "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . ." M.G.L. c 93A, § 11. However, the statute is limited to conduct that "occurred primarily and substantially within the commonwealth" of Massachusetts. Id. The Chartis Insurers argue summary judgment is appropriate on the M.G.L. 93A claim because the "center of gravity" of the conduct here all occurred outside Massachusetts. Tutor Perini, predictably, argues that all of the Chartis Insurers' deceptive and/or unfair trade practices occurred within Massachusetts. However, the Court need not resolve where the alleged deceptive conduct occurred: "When coverage has been correctly denied, as in this case, no violation of the Massachusetts statutes proscribing unfair or deceptive practices may be found."

[8] The ICSOP and National Union policies do not provide any separate basis for coverage. Those policies are "wrap up" endorsements which require Tutor Perini first to seek coverage from the Illinois National and Lloyd's policies--which, as set forth above, it has failed adequately to do.

Transam. Ins. Co. v. KMS Patriots, L.P., 52 Mass App. Ct. 189, 197, 752 N.E.2d 777 (Mass. App. Ct. 2001). Because the Court has determined that the Chartis Insurers properly denied coverage under their respective Policies, the Court finds that Tutor Perini cannot--as a matter of law--establish that the Chartis Insurers engaged in an unfair or deceptive trade practice. Accordingly, the Chartis Insurers are entitled to summary judgment on the M.G.L. c 93A, § 11 claim.

IV. CONCLUSION

For the reasons set forth above, defendants the Chartis Insurers and third-party defendant Certain Underwriter of Lloyd's, London's motions for summary judgment are GRANTED. Accordingly, this action is dismissed in its entirety.

The Clerk of the Court is directed to close motions the motions at Docket Nos. 77 and 81, and to terminate this action.

SO ORDERED:

Dated: New York, New York
November 15, 2012

K. B. Forrest
KATHERINE B. FORREST
United States District Judge